Slip Op. 20-161

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **NIPPON STEEL & SUMITOMO METAL CORPORATION (NOW KNOWN AS NIPPON STEEL CORPORATION)**, | |
| Plaintiff, | |
| v. | |
| **UNITED STATES**, | **Before: Timothy M. Reif, Judge** |
| Defendant, | **Court No. 19-00131** |
| **NUCOR CORPORATION**, | |
| Defendant-Intervenor, | |
| **UNITED STATES STEEL CORPORATION**, | |
| Defendant-Intervenor. | |

[Final Determination sustained.]

### <u>OPINION</u>

    <u>Neil R. Ellis</u>, Sidley Austin, LLP, of Washington, DC argued for plaintiff Nippon Steel & Sumitomo Metal Corporation.  With him on the motion was <u>Richard L.A. Weiner</u>, <u>Rajib Pal</u>, <u>Shawn M. Higgins</u>, <u>Justin R. Becker</u>, and <u>Alex L. Young</u>.

    <u>Kelly Ann Krystyniak</u>, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice of Washington, DC argued for defendant United States. With her on the brief was <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Tara K. Hogan</u>, Assistant Director.  Of Counsel was <u>Jesus N. Saenz</u>, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, Washington, DC.

    <u>Enbar Toledano</u>, Wiley Rein LLP, of Washington, DC argued for defendant-intervenor Nucor Corporation.  With her on the brief was <u>Alan H. Price</u>, <u>Christopher B. Weld</u> and <u>Cynthia C. Galvez</u>.

Dated: <u>November 10, 2020</u>

Reif, Judge: This action involves the final determination of the first administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping order covering hot-rolled steel from Japan.  *See Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*; 2016–2017, 84 Fed. Reg. 31025 (Dep't of Commerce June 28, 2019) ("Final Determination"), and the accompanying Issues and Decision Memorandum (Dep't of Commerce June 21, 2019) ("Decision Memorandum"). Before the court is a USCIT Rule 56.2 motion for judgment on the agency record filed by plaintiff Nippon Steel & Sumitomo Metal Corporation ("NSSMC" or "plaintiff").  *See* Pl.'s Mem. of Points and Authorities in Supp. of Mot. J. Agency R., ECF No. 34 ("Pl. Br.").  Plaintiff argues that the Final Determination is not supported by substantial evidence and is not in accordance with law for two reasons.  First, plaintiff maintains that the decision by Commerce to apply partial adverse facts available ("AFA") is not supported by substantial evidence because NSSMC acted to the best of its ability in supplying Commerce with the downstream sales of its affiliated resellers.  Pl. Br. at 9. Second, plaintiff argues that, even if Commerce was justified in applying partial AFA, the particular AFA that Commerce chose to apply was unreasonable because Commerce "overreached reality" and did not consider properly plaintiff's "level of culpability."  Pl. Br. at 24, 32.  This court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c).  For the reasons set forth below, the court

sustains the Final Determination as supported by substantial evidence and in accordance with law.

**BACKGROUND**

U.S. antidumping law directs Commerce to impose antidumping duties on imported goods when Commerce determines that those goods are sold in the United States at less than fair value and the U.S. International Trade Commission determines that the domestic industry manufacturing those goods is thereby "materially injured, or is threatened with material injury." *See* 19 U.S.C. § 1673(2)(A)(i)–(ii) (2018); *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1306 (Fed. Cir. 2017). "Sales at less than fair value are those sales for which the 'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States)." *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1322, 1326 (Fed. Cir. 2017) (quoting *Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013)).

On October 3, 2016, Commerce published an antidumping order on imports of hot-rolled steel from Japan. *See Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders*, 81 Fed. Reg. 67,962 (Dep't. of Commerce Oct. 3, 2016) ("Order"). In the investigation's final determination preceding the Order, Commerce applied partial AFA as a consequence of plaintiff's failure to report downstream home market sales ("downstream sales") for certain affiliated home market resellers ("affiliated resellers")

that resold hot-rolled steel in the home market.  *See Certain Hot-Rolled Steel Flat*

*Products from Japan: Final Determination of Sales at Less Than Fair Value and Final*

*Affirmative Determination of Critical Circumstances*; 81 Fed. Reg. 53,409 (Dep't of

Commerce Aug. 12, 2016) ("Investigation Final Determination") and the accompanying

Issues and Decision Memorandum (Dep't of Commerce Aug. 4, 2016) ("Investigation

Decision Memorandum").  For purposes of constructing the dumping margin,

Commerce used as AFA the highest NSSMC home market price of the commonly sold

CONNUMS to the affiliated resellers' downstream sales.  Nucor Case Brief at 18, CD

162 (Dec. 14, 2018) (citing the Investigation Decision Memorandum).

   In December 2017, Commerce initiated the first administrative review of the

Order, identifying the period of review as March 22, 2016 to September 30, 2017.  Pl.

Br. at 5; Def.'s Resp. to Pl.'s Mot. J. Agency R., ECF No. 39 ("Def. Br.") at 2.

Commerce selected as mandatory respondents NSSMC and Tokyo Steel

Manufacturing Co., Ltd., the two exporters/producers accounting for the largest volume

of imported subject merchandise at [[  ]] and [[  ]] percent respectively.  Pl. Br. at 5; Def.

Br. at 3; *See* Memorandum re: "Respondent Selection for the Administrative Review of

the Antidumping Order of Certain Hot-Rolled Steel Flat Products from Japan" at 4, CD

11 (Jan. 16, 2018) ("Resp. Selection Memo").  On January 19, 2018, Commerce issued

its standard questionnaire for antidumping administrative reviews to NSSMC.  Pl. Br. at

5; Def. Br. at 3.  The questionnaire asked respondents to report downstream sales by all

affiliated resellers in the home market that fail the arm's-length test.  *See* Letter re:

"Request for Information" at 1, CD 1 (January 19, 2018) ("Questionnaire").

Plaintiff responded to the Questionnaire on March 15, 2018.  NSSMC Section B

Questionnaire Response at B-1, CD 21 (Mar. 15, 2018) ("Questionnaire Response").

Plaintiff determined that sales to [[  ]] of its affiliated resellers failed the arm's-length test

but plaintiff did not report the downstream sales of these affiliated resellers.

Questionnaire Response at B-6, Exhibit B-22.  Instead, plaintiff provided incoming

correspondence from the affiliated resellers, as an exhibit, to illustrate plaintiff's

unsuccessful attempt to obtain the downstream sales from its affiliated resellers.

Questionnaire Response at B-6, Exhibit B-23.  Plaintiff's outgoing letter[1] to the affiliated

resellers stated, in relevant part, that [[  ]].  NSSMC's Section A, B, and C Supplemental

Questionnaire Response at Revised Exhibit B-23, CD 62 (Aug 10, 2018) ("Supp. Quest.

Response").  However, plaintiff stated in its Questionnaire Response that its affiliated

resellers were "unwilling or unable to provide these data in the detail and format

required by the Department."  Questionnaire Response at B-6.  The reasons provided

by the affiliated resellers for this unwillingness or inability may be summarized as: lack

of existing records containing the information; concern over the financial and labor

burden to produce the information; or, an inability to access or produce the information

in the format requested by Commerce due to system limitations.[2]  Questionnaire

Response at Exhibit B-23; *see also* Pl. Br. at 14–15; Def. Br. at 12.

---

[1] Plaintiff's outgoing letter was not included as an exhibit in the Questionnaire Response in the record before the court.  The record reflects that Commerce was provided a copy of plaintiff's outgoing letter for the first time in the Supp. Quest. Response.

[2] The [[  ]] affiliated resellers that did not report downstream sales provided explanations individually as to the reasons that they were unable to provide NSSMC with the downstream sales.  The explanations were: [[  ]]  Questionnaire Response at Exhibit B-23.

In July 2018, Commerce sent plaintiff a supplemental questionnaire asking plaintiff to update its arm's-length test as necessary and reiterating the need for plaintiff to report the downstream sales of all affiliated resellers that fail the test.  Supp. Quest. Response at 3.  The supplemental questionnaire asked plaintiff to

> provide a narrative explanation that details the [[  ]] and the extent to which you have assisted your affiliates in compiling and preparing the downstream sales data.

Supp. Quest. Response at 3.[3]  Plaintiff determined that [[  ]] of its affiliated resellers fail the updated arm's-length test.  Def. Br. at 11 (citing Supp. Quest. Response Exhibit SB-1).  However, plaintiff failed to report the requested downstream sales for [[  ]] of those affiliated resellers.[4]  *Id*.  *See also* Supp. Quest. Response at 3–5.

In its response, NSSMC directed Commerce to a revised exhibit from NSSMC's Questionnaire Response.  The revised exhibit contained additional incoming correspondence from some of the affiliated resellers dated March or April 2018, which appears to respond to "<The reason why we cannot provide further information>". [5] Supp. Quest. Response at Rev. Exhibit B-23.

Before the court, the United States ("Government" or "defendant") notes that "Nippon Steel included as an exhibit the same letter it had provided in its Questionnaire

---

[3] In the Supplemental Questionnaire Response on the record, NSSMC restates the questions by Commerce presumably found in the supplemental questionnaire and then responds to each question in turn.

[4] The resellers that did not report downstream sales included the following, along with the ownership stake held by NSSMC: [[  ]] *See* Supp. Quest. Response at Revised Exhibit SB-1 (P.R. 128-129; C.R. 274-275).

[5] Excerpts from the additional incoming correspondence are as follows: [[  ]]

Response, setting forth its previous unsuccessful attempt to solicit the requested sales

data."  Def. Br. at 4 (citing Supp. Quest. Response at Rev. Exhibit B-23).  Defendant

argues, "The record thus indicated that Nippon Steel made only a single attempt to

acquire the information, making no additional efforts after the issuance of the

supplemental questionnaire."[6]  *Id*.  In response, NSSMC contends that it contacted its

affiliated resellers before Commerce initiated this review, and that NSSMC and its

Japanese counsel, hired to manage the data collection efforts, "made repeated written

requests, as well as numerous telephone calls, to each of the affiliated resellers."  Pl.

Br. at 11–12 (citing Supp. Quest. Response at 4).  In the Supplemental Questionnaire

Response, plaintiff noted that it sent each affiliated reseller a database containing "all of

the information in NSSMC's possession related to sales of subject merchandise to that

reseller during the [[  ]]."  Supp. Quest. Response at 4.

On November 14, 2018, Commerce published its preliminary determination.  *See*

*Certain Hot-Rolled Steel Flat Products From Japan: Preliminary Results of Antidumping*

*Duty Administrative Review and Preliminary Determination of No Shipments; 2016-*

*2017*, 83 Fed. Reg. 56813 (Dep't of Commerce Nov. 14, 2018) ("Preliminary

Determination"), and the accompanying Issues and Decision Memorandum at 1 (Dep't

of Commerce Nov. 1, 2018) ("Preliminary Decision Memorandum").  Commerce

preliminarily determined that the downstream sales were missing from the record and

---

[6] Notably, defendant's position before the court differs from the characterization by
Commerce of what the record shows during the administrative review: "The fact that the
record shows that Nippon Steel contacted all of its affiliated resellers with multiple
rounds of correspondence and telephone calls, even before the review was initiated,
does not change the fact that the necessary home market price data are missing from
the record."  Preliminary Decision Memorandum at 12.

that NSSMC had failed to act to the best of its ability in providing this information to

Commerce.  Preliminary Decision Memorandum at 12.  On the basis that NSSMC had

failed to act to the best of its ability, Commerce determined that the application of partial

AFA was warranted and preliminarily applied the highest NSSMC home market product

matching CONNUM-specific price as AFA.  *Id.*  As a result, Commerce preliminarily

calculated an estimated weighted-average dumping margin of 0.54 percent for NSSMC.

Preliminary Determination.

On December 14, 2018, and December 21, 2018, NSSMC submitted its

administrative case brief and its rebuttal brief, respectively.  Pl. Br. at 6; Def.-Intervenor

Nucor Corp.'s Resp. Br., ECF No. 41 ("Def.-Inter. Br.") at 6.  NSSMC argued that

Commerce erred by applying partial AFA to the downstream sales of affiliated resellers.

*See* NSSMC's Case Brief at 5–15, CD 148 (Dec. 14, 2018).  In its rebuttal brief,

NSSMC argued that, if Commerce were to continue to apply partial AFA, Commerce

should apply partial AFA to the downstream sales of only those affiliated resellers that

the record indicates were capable of providing the requested downstream sales but

were unwilling to do so.  *See* NSSMC's Rebuttal Brief at 18, CD 167 (Dec. 21, 2018).

On June 28, 2019, Commerce issued its Final Determination, in which

Commerce determined that it would continue to apply partial AFA to the downstream

sales of affiliated resellers due to the failure of NSSMC to act to the best of its ability.

Decision Memorandum at 15–16.  Commerce also made changes to the AFA

methodology used for NSSMC and Tokyo Steel Manufacturing Co., Ltd., the other

mandatory respondent.  *See* Final Determination.  Instead of continuing to apply the

highest NSSMC home market price of a sale of a product with a matching CONNUM,

Commerce applied the highest NSSMC home market price of a sale of a product within

the commonly sold CONNUMs, Decision Memorandum at 15–16, consistent with

Commerce's methodology in the Investigation Final Determination.  Def.-Inter. Br. at 7.

Commerce explained that looking only to the sales of products in the home market with

a matching CONNUM provided a "more limited pool from which to select an appropriate

AFA rate."  Decision Memorandum at 16.  Commerce further explained, "[t]o ensure that

the selected AFA rate will induce cooperation, we find it appropriate to evaluate a

broader pool, i.e., the respondent's home market sales, in selecting an AFA rate for

these unreported sales."  Decision Memorandum at 16.  Applying this AFA

methodology, Commerce calculated an estimated weighted-average dumping margin of

7.64 percent for NSSMC.  *See* Final Determination.  After publication of the Final

Determination, NSSMC timely commenced this action on January 27, 2020, to

challenge the Final Determination in this first administrative review.  Pl. Br. at 7.

## STANDARD OF REVIEW

The court has jurisdiction over an action filed by an interested party challenging

the final determination by Commerce in an administrative review of an antidumping duty

order.  19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c).  In reviewing a

determination under section 516a of the Tariff Act of 1930, as amended, the court

reviews the administrative record based on the substantial evidence standard, giving

deference to "Commerce's special expertise in administering the anti-dumping law[s]."

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir.

2002) (citations omitted).  The court will uphold a determination by Commerce unless it

is "unsupported by substantial evidence on the record, or otherwise not in accordance

with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  *See also Micron Tech. Inc. v. United States*,

117 F.3d 1386, 1393 (Fed. Cir. 1997).  Substantial evidence is "more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

When reviewing an action by Commerce, the court looks for "a reasoned analysis

or explanation for an agency's decision . . . .  An explicit explanation is not necessary,

however, where the agency's decisional path is reasonably discernible."  *Wheatland

Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (citations omitted).

"An agency finding may still be supported by substantial evidence even if two

inconsistent conclusions can be drawn from the evidence."  *Dongtai Peak Honey Indus.

Co. v. United States*, 777 F.3d 1343, 1349 (Fed. Cir. 2015) (citation omitted).

## Determination by Commerce to Apply Partial AFA

### LEGAL FRAMEWORK

When conducting an antidumping investigation or an administrative review of an

antidumping order, Commerce solicits information from the respondents — both foreign

producers and exporters — to determine whether dumping has occurred and, if so, to

calculate a dumping margin.  When necessary information is not available on the

record, Commerce must select from "facts otherwise available" to fill any gaps in the

record and complete the investigation or administrative review.  19 U.S.C. § 1677e(a).

Once Commerce has determined that it is necessary to select from "facts otherwise

available" to fill a gap in the record, Commerce then evaluates whether to apply an

adverse inference, also commonly known as adverse facts available or AFA.  19 U.S.C.

§ 1677e(b).  Commerce may decide to apply AFA when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b).

## I.    The Best of Its Ability Standard

To determine whether Commerce may apply AFA to a respondent under 19 U.S.C. § 1677e(b), the Federal Circuit in *Nippon Steel Corp.* established a standard that requires Commerce, based on both an objective and subjective showing, to determine whether the respondent had acted to the "best of its ability."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

The objective element asks whether a reasonable respondent "would have known that the requested information was required to be kept and maintained."  *Id*. at 1376.  The objective element assumes that a respondent is "familiar with the rules and regulations that apply to the import activities undertaken."  *Id*. at 1382.  It requires that respondents:

> (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.

*Id.*  The Federal Circuit made clear, "while the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping."  *Id*.

The subjective element has two aspects.  First, it requires that Commerce make a subjective showing that the respondent under investigation or review has failed to produce promptly the requested information.  *Id.*  Second, it requires that the "failure to

fully respond is the result of the respondent's lack of cooperation in either: (a) failing to

keep and maintain all required records, or (b) failing to put forth its maximum efforts to

investigate and obtain the requested information from its records."  *Id.* at 1382–83.  As

such, "An adverse inference may not be drawn merely from a failure to respond, but

only under circumstances in which it is reasonable for Commerce to expect that more

forthcoming responses should have been made; i.e., under circumstances in which it is

reasonable to conclude that less than full cooperation has been shown."  *Id.* at 1383.

Finally, whether a respondent intended to comply with its statutory obligations is

irrelevant for determining whether the application of AFA is appropriate when

information is missing from the record.  *Id*. (noting the requirement to apply AFA is

"simply a failure to cooperate to the best of the respondent's ability, regardless of

motivation or intent").

## II.     Maximum Efforts Regarding Affiliates

U.S. antidumping law defines "affiliated persons" to include multiple relationships.

19 U.S.C. § 1677(33).  One definition is that of a shareholder or stockholder, "[a]ny

person directly or indirectly owning, controlling, or holding with power to vote, 5 percent

or more of the outstanding voting stock or shares of any organization and such

organization."  19 U.S.C. § 1677(33)(E).

This Court has addressed "affiliated persons" in the context of the best of its

ability standard.  In *Kawasaki*, this Court recognized that Commerce has a "general

practice of attributing failure of an affiliate to the respondent."  *Kawasaki Steel Corp. v.

United States*, 24 CIT 684, 694, 110 F. Supp. 2d 1029, 1038 (2000).  In *Hyundai Steel

Co.*, this Court determined that an "assessment of whether [a respondent] put forth its

maximum efforts to investigate and obtain the requested information from its records,

necessarily must assess whether [it] could or should have been able to obtain the

information in its affiliate's possession." *Hyundai Steel Co. v. United States*, 42 CIT __,

__, 319 F. Supp. 3d 1327, 1345 (2018) (internal quotation omitted).  Further, this Court

has also determined, and the Federal Circuit affirmed, that a respondent has the burden

to show that it could not compel its affiliate to provide the necessary information.  *Ta*

*Chen Stainless Steel Pipe, Inc. v. United States*, 24 CIT 841, 846 (2000), *aff'd*, 298 F.3d

1330 (Fed. Cir. 2002).

**DISCUSSION**

Commerce determined under § 1677e(a) that necessary information, the

downstream sales of the affiliated resellers, was not available on the record.  Decision

Memorandum at 16.  Commerce described the missing information as "fundamental

data, without which Commerce cannot perform the dumping calculation required by the

statute."  *Id*.  As such, Commerce is required to gap fill using facts otherwise available

to continue its administrative review.  19 U.S.C. § 1677e(a).  To determine whether the

facts otherwise available should have an adverse inference, Commerce analyzed

whether plaintiff "failed to cooperate by not acting to the best of its ability to comply with

a request for information from [Commerce]."  19 U.S.C. § 1677e(b).

Commerce determined that plaintiff "failed to cooperate to the best of its ability in

obtaining these companies' downstream sales" because plaintiff had "ownership

leverage" and "establishes the prices of sales to its affiliates."  Decision Memorandum at

16.  As a result, Commerce concluded that plaintiff was in a position to induce the

affiliated resellers to report their downstream sales.  *Id*.  On review, the court looks at

the record and the objective and subjective showings supplied by Commerce to

determine whether the determination by Commerce was supported by substantial

evidence.  *See Nippon Steel Corp.*, 337 F.3d at 1382.

       In the instant case, the objective question is what would be expected of a

reasonable respondent in respect of obtaining from the affiliated resellers and providing

to Commerce information on downstream sales by those affiliated resellers?[7]

Commerce expected plaintiff to be able to obtain the downstream sales from its

affiliated resellers because of its "ownership leverage."  *See* Decision Memorandum at

16.  Plaintiff has an ownership stake between [[  ]] percent in the majority of the affiliated

resellers.[8]  Def. Br. at 14; Pl.'s Reply in Supp. of Mot. J. Agency R., ECF No. 43 ("Pl.

Reply Br.") at 6.  In addition to a substantial ownership interest in the affiliated resellers,

Commerce determined that plaintiff is the top exporter/producer, accounting for [[  ]]

percent of the total U.S. imports of the subject merchandise during the period of review.

Resp. Selection Memo at 4.  Taking the record as a whole, Commerce reasonably

inferred that the ownership interest and strong market position constitute leverage and

reasonably expected that plaintiff could obtain the downstream sales from its affiliated

resellers.

---

[7] There is no dispute that the resellers are "affiliated" under the definition of § 1677(33).
"Nippon Steel's ownership interest of the [[  ]] unreported affiliated resellers ranged from
[[  ]]".  Def. Br. at 14.

[8] Defendant states that NSSMC's ownership interest in the [[  ]] unreported affiliated
resellers in the majority of cases was "over [[  ]]."  Def. Br. at 14.  Plaintiff responds that
"NSSMC held a minor, non-controlling ownership share (no more than [[  ]]%) in all but
one of the [[  ]] affiliated resellers to which the Department applied AFA."  Pl. Reply Br.
at 6.

While the objective showing is satisfied, Commerce missed an opportunity to highlight yet an additional reason that it reasonably expected plaintiff to be able to provide these downstream sales.  In particular, the court is puzzled as to the reason that Commerce failed to punctuate in its Decision Memorandum that this respondent in the administrative review, now plaintiff, had specific notice that Commerce would request its affiliated resellers' downstream sales in a review.  In its Decision Memorandum, Commerce summarized an argument from petitioner's rebuttal brief stating "[i]n the original investigation, Commerce applied partial AFA to Nippon Steel for its failure to report affiliated downstream sales, [sic] for the same reason, Commerce should continue to apply partial AFA to Nippon Steel on these unreported affiliated downstream sales in this administrative review."  Decision Memorandum at 15.  The record of this proceeding demonstrates that Commerce asked for the downstream sales in the investigation.  *Id*.  *See also* Def.-Inter. Br. at 17.  That fact would indicate to a reasonable respondent that Commerce would likely want this same information in a subsequent review.

Turning to the subjective showing, Commerce reasonably determined that plaintiff did not put forth its "maximum efforts" to obtain the downstream sales as required by statute because Commerce found that NSSMC was "in a position to induce these companies to report their downstream sales," and failed to induce or attempt to induce its affiliated resellers.  *See* Decision Memorandum at 16.  To make a subjective showing, Commerce is required to show that: (1) plaintiff failed to produce promptly the downstream sales; and, (2) this failure by plaintiff was "the result of the respondent's lack of cooperation in either (a) failing to keep and maintain all required records, or (b)

failing to put forth its maximum efforts to investigate and obtain the requested

information from its records." *Nippon Steel Corp.,* 337 F.3d at 1382-83.

Commerce stated in its Preliminary and Final Determinations that plaintiff failed

to produce the downstream sales. Decision Memorandum at 16. The fact that the

downstream sales were not produced is undisputed; the court turns to whether the

record supports the determination by Commerce that plaintiff failed to meet either the

"(2)(a)" or "(2)(b)" elements as identified by the Federal Circuit in *Nippon Steel Corp*.

337 F.3d at 1382-83.

Plaintiff makes several arguments as to the reasons that it acted to the best of its

ability. First, NSSMC contends that it put forth its "maximum efforts" because it:

contacted the affiliated resellers before Commerce initiated this review; hired Japanese

counsel to manage the data collection efforts; "made repeated written requests, as well

as numerous telephone calls, to each of the affiliated resellers" and sent each affiliated

reseller a database containing the relevant sales from plaintiff to the affiliated reseller.

Pl. Br. at 11-12 (citing Supp. Quest. Response at 4). Plaintiff argues that it is not

responsible for the unwillingness or inability of its affiliated resellers to provide their

downstream sales. *See* Pl. Br. at 13.

Plaintiff appears to overstate the extent of its efforts. The court's review of the

record reveals that plaintiff sent one letter to its affiliated resellers. *See* Supp. Quest.

Response at Rev. Exhibit B-23. Defendant's brief reflects the record in this respect.

*See* Def. Br. at 12. There is a modest reference in Commerce's Preliminary Decision

Memorandum that alludes to other facts not contained in the record. Preliminary

Decision Memorandum at 12. As those ostensible facts do not appear in the record,

there is no basis for the court to consider them.  The court notes that when discussing the efforts of a respondent in the context of a best of its ability analysis, Commerce and defendant must take care to portray the record accurately and consistently throughout the administrative proceeding and before this court.

Defendant likens the instant matter to that reviewed by the Court in *Kawasaki Steel Corp.*, 110 F. Supp. 2d at 1038.  In *Kawasaki Steel Corp.*, the Court sustained Commerce's decision to apply AFA because the record demonstrated that Kawasaki possessed the ability to influence its affiliate but took a "hands-off" approach by "merely opt[ing] to exchange correspondence with its affiliate and then acquiesc[ing] to any communication from [its affiliate] that could be interpreted as a sign of resistance" in obtaining the requested data.  *Kawasaki Steel Corp.*, 110 F. Supp. 2d at 1037-38.

In the instant case, Commerce reasonably determined that NSSMC possessed the ability to influence its affiliated resellers due to its "ownership leverage."  *See* Decision Memorandum at 16.  Commerce therefore reasonably expected plaintiff to utilize its "ownership leverage" to obtain the downstream sales from its affiliated resellers.  The record reveals that plaintiff sent one letter to its affiliated resellers requesting their downstream sales; the record does not show that plaintiff exerted its "ownership leverage" to induce compliance.  *See* Supp. Quest. Response at Rev. Exhibit B-23.  While some additional incoming correspondence dated March to April 2018 indicates that there may have been some additional outreach by plaintiff, the record is devoid of any information that plaintiff exerted any leverage to induce, or attempt to induce, the affiliated resellers to provide their downstream sales.  In fact, there is nothing in the record showing that NSSMC made any efforts to address its

affiliated resellers' concern over the financial and labor burden to produce the

information or to address its affiliated resellers' alleged inability to access or produce the

information in the format requested by Commerce due to system limitations.  It is

plaintiff's burden to create an "adequate record before Commerce," *Hyundai Steel Co.*,

319 F. Supp. 3d at 1345, and yet plaintiff challenges Commerce's determination on the

basis of largely undocumented assertions and a record revealing one outgoing letter.

Consequently, it was reasonable for Commerce to determine that plaintiff's efforts

amounted to less than full cooperation and that NSSMC should have provided more

forthcoming responses to Commerce containing more data from its resellers.

For its second argument, plaintiff claims that it is not in a position to induce its

affiliated resellers because it owns only minority shares in some of the affiliated

resellers.  Pl. Br. at 16.  The applicable statute provides that even minority shares that

are 5 percent or more are sufficient to prove affiliation, and as such, an indication of

control.  *See* 19 U.S.C. § 1677e(33).  In addition to ownership interest, plaintiff has a

strong position in the Japanese steel market as indicated by plaintiff supplying [[  ]]

percent of imports during the period of review.  *See* Resp. Selection Memo at 4.  Based

on the record before the court, Commerce made a reasonable determination that

plaintiff had "ownership leverage," from which Commerce inferred that NSSMC was in a

position to induce its affiliates.[9]  Decision Memorandum at 16.  Again, it is plaintiff's

---

[9] "Moreover, the record shows that Nippon Steel has ownership leverage as well as an absolute veto power over whether to sell to, or continue to do business with, an affiliate. In fact, it is Nippon Steel that establishes the prices of sales to its affiliates, thus, Nippon Steel is in a position to make these sales at arm's-length prices or not.  Based on this information, we continue to find that Nippon Steel is in a position to induce these companies to report their downstream sales."  Decision Memorandum at 16.

burden under *Ta Chen* to put information on the record that contradicts the Final

Determination and shows plaintiff's inability to induce action by its affiliated resellers.

Relatedly, plaintiff attempts to shift the burden as stated by the Court in *Ta Chen*

by arguing that Commerce needed to demonstrate that NSSMC would have been

successful in its attempts to induce its affiliated resellers before Commerce could apply

partial AFA.  *See* Pl. Br. at 17.  The court is unpersuaded by plaintiff's argument.  It is

plaintiff that has the burden to show that it acted to the best of its ability to comply with

Commerce's requests.

The best of its ability standard does not require that a respondent in an

investigation or review achieve perfection or total success.  Rather, the standard

requires that a respondent use its maximum efforts.

In the instant case, NSSMC did not exert maximum efforts.  *See Nippon Steel*

*Corp.*, 337 F.3d at 1382.  Based on the record, Commerce had a reasonable

expectation that plaintiff would have been able to obtain the downstream sales of its

affiliated resellers due to plaintiff's "ownership leverage."  Decision Memorandum at 16.

Commerce made an objective showing as to ownership leverage as set out in *Nippon*

*Steel Corp*.  *See Nippon Steel Corp.*, 337 F.3d at 1382.  As a consequence, plaintiff had

the obligation either to use its "maximum efforts" to obtain the downstream sales or to

put on the record information that demonstrated that Commerce's expectation was not

reasonable.  *See Id.* at 1382–1383.  Plaintiff did neither.  As a consequence,

Commerce's application of partial AFA was reasonable because NSSMC did not act to

the best of its ability.

## Selection of AFA by Commerce

### LEGAL FRAMEWORK

After Commerce determines that necessary information is missing from the record and that a respondent has not acted to the best of its ability and, on that basis, to apply AFA, Commerce selects the appropriate information for AFA. "The Department's practice when selecting an adverse rate from among the possible sources of information is to ensure that the margin is sufficiently adverse so as to effectuate the purpose of the facts available role to induce respondents to provide the Department with complete and accurate information in a timely manner." *Shandong Mach. Imp. & Exp. Co. v. United States*, 34 CIT 1001, 1006 (2010) (internal citations and quotations omitted). When making an adverse inference, Commerce may rely on information derived from "the petition, . . . a final determination in the investigation under this title, . . . any previous review . . . or determination  . . . , or . . . any other information placed on the record." 19 U.S.C. § 1677e(b)(2).

In 2015, Congress passed the Trade Preferences Extension Act (TPEA), which among other things, modified several provisions of § 1677e, which governs the application of AFA. First, the TPEA provides that Commerce is not required to determine, or make any adjustments to, a weighted average dumping margin to account for the factual information that a respondent might have provided but did not. *See* 19 U.S.C. § 1677e(b)(1)(B). Second, the modified statute states that when selecting AFA, Commerce is "not required for purposes of [corroboration] or for any other purpose . . . to demonstrate that the . . . dumping margin used by the administering authority reflects an alleged commercial reality of the interested party." 19 U.S.C. § 1677e(d)(3).

Section 1677e, before and after the enactment of the TPEA, requires that

Commerce corroborate AFA when Commerce relies on secondary information or

information not obtained in the pertinent segment of the investigation or review.  *See* 19

U.S.C. § 1677e(c)(1).  To "corroborate" information means that Commerce has

ascertained that the information has "probative value."  *Papierfabrik August Koehler SE*

*v. United States*, 843 F.3d 1373, 1380 (Fed. Cir. 2016).

This Court has repeatedly held that Commerce is not required to corroborate

primary information, that is, information on the record obtained in the investigation or

review in question.  *See BMW of N. Am. LLC v. United States*, 44 CIT __, __, 437 F.

Supp. 3d 1336, 1341 (2020) ("Commerce need not corroborate the use of information

on the record that was obtained during the instant segment of the proceeding (i.e.,

primary information)"); *see also Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333,

1349 (Fed. Cir. 2016) ("§ 1677e(c) unambiguously does not require Commerce to

corroborate primary information.").  Although Commerce is not required to corroborate

primary information, Commerce may not select as AFA information that is

unreasonable.

## DISCUSSION

Plaintiff presents two overarching arguments as reasons that the AFA selected

by Commerce is not supported by substantial evidence.  First, plaintiff argues that the

AFA is an "overreach of reality" because the transaction selected: (A) was of a product

of a "form, CONNUM, and specification different and more expensive than nearly all of

the sales for which AFA was applied"; and, (B) was "impermissibly small."  Pl. Br. at 24.

Second, plaintiff contends that the AFA selected was unreasonable because Commerce failed to properly consider plaintiff's "level of culpability." Pl. Br. at 32-34.

## I.      The AFA Selected by Commerce Is Reasonable

The inquiry into whether Commerce "overreach[es] reality" in selecting AFA pertains to the longstanding objective of AFA, to balance accuracy with deterrence. *See BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1300 (Fed. Cir. 2019) ("The AFA rate is intended to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance. While a higher adverse margin creates a stronger deterrent, Commerce must not overreach reality in seeking to maximize deterrence." (citing *De Cecco*, 216 F.3d at 1032.)). An assessment of whether AFA "overreach[es] reality" in the post-TPEA legal landscape does not equate to or revive the pre-TPEA inquiry into whether the resulting dumping margin reflects a "commercial reality." *See* 19 U.S.C. § 1677e(d)(3)(B).

In the instant case, plaintiff contests the AFA on the grounds that it was: (A) of a product with a "form, CONNUM, and specification different and more expensive than nearly all of the sales for which AFA was applied"; and, (B) "impermissibly small." Pl. Br. at 24. On this basis, plaintiff asserts that the AFA selected by Commerce was unreasonable.

The court turns to determining whether the sale on which the AFA is based is unreasonable. In making this determination, the court reiterates the "broad discretion" afforded to Commerce in selecting AFA. *Hyundai Steel Co.*, 319 F. Supp. 3d at 1355. This Court has found that "true outliers based on the nature of the transaction or product involved" should be excluded. *Id.* at 1355-1356 (finding AFA based on primary

information unreasonable when "defendant acknowledge[d] that the sale in question
was invoiced differently because of the nature of the product, recognizing that it was
atypical of Hyundai Steel's U.S. sales.")  In doing so, the Court has cautioned that the
exclusion of outlier transactions is not an imposition of a "representational test."  *Id.* at
1356.  "Congress did not require Commerce to select adverse facts that 'reflect a
certain amount of sales, yield a particular margin, fall within a continuum according to
the application of particular statistical methods, or align with standards articulated in
other statutes and regulations.'"  *Id.* at 1355 (citing *Nan Ya Plastics*, 810 F.3d at 1347).

In the instant case, Commerce selected as AFA the highest home market sales
price of the commonly-sold CONNUMs.  Def. Br. at 20.  Commerce applied this AFA to
the unreported downstream sales.  *Id*.  Significantly, Commerce used primary
information — plaintiff's own data on the record.  Def. Br. at 20; *see also* Decision
Memorandum at 16.  While *Hyundai Steel Co*. demonstrates that the use of primary
information is not in itself a guarantee against finding AFA to be unreasonable, plaintiff
has a challenging burden to demonstrate the reason that the use for AFA of plaintiff's
own data, supplied to Commerce in the immediate proceeding, is not supported by
substantial evidence.

Further, Commerce utilized the AFA methodology from the investigation when it
elected to look to the pool of "commonly-sold CONNUMs" for selecting AFA instead of
only "matching CONNUMS" as it did in the Preliminary Determination.  Def. Br. at 20;
*see also* Final Determination.  Commerce's application of a methodology that was used
in the investigation is consistent with its normal practice.  See *Fujian Mach. & Equip.*
*Imp. & Exp. Corp. v. United States*, 25 CIT 1150, 1169, 178 F. Supp. 2d 1305, 1327

(2001) (quoting *Cinsa, S.A. de C.V. v. United States*, 21 CIT 341, 349, 966 F. Supp.

1230, 1238 (1997) ("Commerce can reach different determinations in separate

administrative reviews but it must employ the same methodology or give reasons for

changing its practice.")).

   In short, Commerce has wide discretion in selecting AFA.  In this case,

Commerce used primary information and applied a consistent methodology.  Both are

reasonable practices when selecting AFA.

   In laying out its case, plaintiff first argues that the AFA sale is not supported by

substantial evidence because it was of a product of a "form, CONNUM, and

specification different and more expensive than nearly all of the sales for which AFA

was applied".  Pl. Br. at 24.  Plaintiff argues that it was impermissible for Commerce to

use an AFA sale of a product whose form was a square or a rectangle, rather than a

coil.  Pl. Br. at 24-25.  Plaintiff implies that a sale in coil form would have been the

appropriate form for the application of AFA because "virtually all" (i.e., [[  ]] percent) of

the sales for which AFA was applied were in coil form.  *See* Pl. Br. at 24-25.  On this

point, defendant-intervenor argues that because NSSMC did not put information

regarding the downstream sales on the record "there is no way to determine whether

NSSMC's unreported resellers cut NSSMC's coiled steel into sheets or subjected it to

any other additional processing before resale."  Def-Inter. Br. at 25.

   The record indicates that form was the seventh factor out of nine examined by

Commerce to compare products.  Preliminary Decision Memorandum at 17.  Plaintiff

does not indicate any concerns with the other eight factors that Commerce considered,

specifically, the six to which Commerce gave a greater weight when comparing

products.  As Commerce explained, "In making product comparisons, we matched foreign like products based on prime versus nonprime merchandise and the physical characteristics reported by the respondents in the following order of importance: paint, carbon, quality, strength, thickness, width, form, pickled and pattern."  *Id*.  Plaintiff's criticism of form feeds its criticism of the CONNUM selected by Commerce because form is one of the nine "product characteristics" used in identifying CONNUMs.  Pl. Br. at 26.  Therefore, in plaintiff's view, because the form of the AFA sale did not match "virtually all" of downstream sales, the CONNUM selected was also improper.  *See* Pl. Br. at 24-26.  Commerce points out that "The CONNUMH[10] Commerce selected to fill the gap of missing sales contained [[  ]] of sales."  Def. Br. at 20.  Accordingly, Commerce argues that selecting an AFA sale from this CONNUM was not unreasonable.  *Id*. at 20-21.

Plaintiff also asks the court to find that the AFA sale is unreasonable based on price.  *See* Pl. Br. at 26-27.  Plaintiff argues that the "specification was one of the most expensive sold by NSSMC" and that the CONNUM selected was "one of the most expensive sold by NSSMC in the entire home market sales database" after comparing averages.  Pl. Br. at 26-27.  Plaintiff states that Commerce used as AFA in the Final Determination, "the highest priced sale of this CONNUM" [[  ]] yen/MT when all but one other sale was less than [[  ]] yen/MT.  Pl. Br. at 26.

Defendant and defendant-intervenor argue that Commerce has the discretion to choose an AFA sale with the highest price.  *See* Def. Br. at 20; Def.-Inter. at 21.

---

[10] Defendant refers to the control number as "CONNUMH" for the home market in its brief whereas plaintiff and defendant-intervenor use the generic term "CONNUM."

Defendant infers this discretion from § 1677e(d)(2)–(3), which authorizes Commerce to rely on the highest prior dumping margin.  Def. Br. at 20.  Defendant points out that Commerce's selection of the highest price as AFA was the same methodology used in the investigation.  Def. Br. at  20.  Defendant-intervenor argues that "Commerce routinely assigns as AFA the highest price available."  Def.-Inter. at 21 (quoting several issue and decision memorandums in which Commerce assigned the "highest available price" as AFA).

Plaintiff argues that the AFA sale is "impermissibly small."  Plaintiff explains that the price selected as AFA represented an outlying transaction that comprised only [[   ]] of NSSMC's sales and, therefore, is "too small for use as AFA."  Pl. Br. at 29.  To bolster its argument, plaintiff seeks to liken the instant case to the *Dongguan* cases, in which this Court found that the dumping margins resulting from the application of product-specific AFA used by Commerce were based on "impermissibly small" percentages of sales ranging from 0.007% to 0.379%.  *Dongguan Sunrise Furniture Co. v. United States*, 37 CIT 489, 492-493 n.3, 904 F. Supp. 2d 1359, 1363 n.3 (2013).  Plaintiff points out that these "impermissibly small" percentages are substantially larger than the [[   ]] at issue in this case.  Pl. Br. at 31.

However, the *Dongguan* cases differ from the instant matter in three crucial respects.  First, the *Dongguan* cases preceded the enactment of TPEA and, accordingly, Commerce was required at that time to demonstrate that the AFA was a "commercial reality" — a feat that is harder to prove with a smaller sale size.  In the instant matter, with the enactment of the TPEA, Commerce is no longer required to determine a respondent's "commercial reality."

     Plaintiff's argument on *Dongguan* is not persuasive also for a second reason: namely, the resulting dumping margins in the *Dongguan* cases were significantly higher, ranging from 130 to over 200 percent, whereas the resulting dumping margin in the instant case is much smaller at 7.64 percent.  *Dongguan*, 904 F. Supp. 2d at 1364.  The *Dongguan* court suggested that a sliding scale analysis is appropriate in determining whether a sale is "impermissibly small" when the Court said, "A larger percentage of a party's sales is needed to support a very high margin in order for Commerce to be able to demonstrate that the sales relied on are representative of the respondent's commercial reality."  *Id*.

     Finally, in the first *Dongguan* case, the Court remanded the case to Commerce because in addition to the number of sales being "impermissibly small," the data utilized to compute AFA were another respondent's data, despite the availability in that case of plaintiff's own data.  *Dongguan Sunrise Furniture Co. v. United States*, 36 CIT 860, 873, 865 F. Supp. 2d 1216, 1233-34 (2012).  In this case, by contrast, Commerce used plaintiff's own data, supplied to Commerce in the immediate proceeding.  As to the sales used as a basis for AFA, as defendant points out, the statute does not provide and the Court has not determined an acceptable percentage of sales "upon which to base an AFA rate."  Def. Br. at 21.  Additionally, the Court has not determined that a dumping margin is unsupported by substantial evidence based on an AFA's percentage of sales alone.

     In conclusion, aside from showing that the AFA sale selected by Commerce is small, plaintiff has not shown that the AFA sale is unreasonable.  Significantly, "The SAA also states that Commerce does not have to prove that the facts available are the

best alternative information.  'Rather, the facts available are information or inferences

which are reasonable to use under the circumstances.'" *Ta Chen*, 24 CIT at 850, citing

SAA at 869, 1994 U.S.C.C.A.N. at 4198.  Commerce acted reasonably in its selection of

AFA.

## II.    Commerce Articulated a Reasonable Rationale for Its Selection of AFA

Plaintiff argues that the AFA selected was unreasonable because Commerce

failed to consider properly the plaintiff's "level of culpability."  Pl. Br. at 32-34.  The

objective of the application of AFA is to strike a balance between accuracy and

deterrence.  *See BMW of N. Am. LLC*,926 F.3d at 1300 (citing *De Cecco*, 216 F.3d at

1032).  In *BMW*, the Federal Circuit explained that "case law establishes that

Commerce must consider the totality of the circumstances in selecting an AFA rate,

including, if relevant, the seriousness of the conduct of the uncooperative party."  *BMW*,

926 F.3d at 1302 (remanding the case when Commerce failed to "address how the

procedural irregularities surrounding the administrative review process affected its view

of BMW's level of culpability" and, therefore, left the Federal Circuit unable to ascertain

whether Commerce properly selected an AFA rate that was reasonable.)

Consequently, not only is it important that Commerce consider the "totality of the

circumstances," but Commerce also must articulate its rationale for selecting AFA so

that the court may ascertain whether Commerce's selection and application of the

particular AFA is supported by substantial evidence.  *Id*.

Plaintiff states that its dumping margin increased by a multiple of 14 from the

Preliminary Determination to the Final Determination.  Pl. Br. at 34.  However, the more

relevant comparison is between NSSMC's dumping margin in the investigation and the

margin in this review.  As § 1677e(d)(1)(B) makes clear, Commerce could have applied the 4.99 percent dumping margin in the Investigation Final Determination to NSSMC in the administrative review.  However, as defendant-intervenor notes and the record demonstrates, the investigation dumping margin did not achieve the deterrent objective because the information missing from the record in this administrative review is the very same information that Commerce requested and that plaintiff failed to provide in the investigation.  Def.-Inter. Br. at 23.  Commerce articulated its purpose for selecting this particular AFA — to pick an AFA sufficiently adverse to induce cooperation where the investigation's AFA had not achieved that goal:

> In the Preliminary Results, we applied the highest Nippon Steel home market product matching CONNUM-specific price for unaffiliated customers to these unreported affiliated companies' resales.  In *Hot Rolled from Japan*, we applied the highest Nippon Steel home market unaffiliated sales price to all unreported affiliated companies' resales.  The matching CONNUM-specific home market provides a more limited pool from which to select an appropriate AFA rate.  To ensure that the selected AFA rate will induce cooperation, we find it appropriate to evaluate a broader pool, *i.e.*, the respondent's home market sales, in selecting an AFA rate for these unreported sales.

Decision Memorandum at 16.  Consequently, the record indicates that Commerce calculated and applied a dumping margin higher than 4.99% to achieve a deterrent effect, where the 4.99% had failed to do so in the Investigation Final Determination.  Commerce articulated a reasonable rationale for its selection of the particular AFA rate.

## CONCLUSION

In the 2003 film, LOST IN TRANSLATION,[11] Charlotte, played by Scarlett Johansson opposite Bill Murray, says of their time in Japan, "let's never come here again because it will never be as much fun."

---

[11] LOST IN TRANSLATION (Focus Features 2003).

* * *

Commerce's decision to apply partial AFA and the AFA Commerce selected in the Final Determination are reasonable.  Therefore, the court sustains Commerce's Final Determination.  Judgment will enter accordingly.


/s/ Timothy M. Reif
Timothy M. Reif, Judge

        Dated:  November 10, 2020
                     New York, New York